**IN THE COURT OF APPEALS OF IOWA**
No. 15-0741
Filed March 22, 2017

**JASON CANNON,**

Plaintiff-Appellant,

**vs.**

**BODENSTEINER IMPLEMENT COMPANY,
WINDRIDGE IMPLEMENTS, LLC, ECK &
GLASS, INC., d/b/a EPG INSURANCE, INC.,
and CNH AMERICA LLC, d/b/a CASE IH,**

Defendants-Appellees.

_____

Appeal from the Iowa District Court for Clayton County, John J. Bauercamper, Judge.

Jason Cannon appeals the district court's grant of summary judgment to defendants. **AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

Judith M. O'Donohoe of Elwood, O'Donohoe, Braun & White, L.L.P., Charles City, for appellant.

A. John Arenz, McKenzie R. Hill, and Brenton M. Tunis of O'Connor & Thomas, P.C., Dubuque, for appellee Bodensteiner Implement Company.

Andrew P. Nelson of Meyer, Lorentzen & Nelson, Decorah, for appellee Windridge Implements, LLC.

ELECTRONICALLY FILED    MAR 22, 2017    CLERK OF SUPREME COURT

Michael A. McEnroe and Erin Patrick Lyons of Dutton, Braun, Staack & Hellman, P.L.C., Waterloo, for appellee Eck & Glass, Inc., d/b/a EPG Insurance Inc.

Richard J. Kirschman of Whitfield & Eddy, P.L.C., Des Moines, for appellee CNH America, LLC, d/b/a Case IH.

Considered by Vaitheswaran, P.J., and Doyle and Mullins, JJ.

**MULLINS, Judge.**

This action arises from Jason Cannon's purchase of a defective tractor, for which Cannon brought numerous causes of action against Bodensteiner Implement Company (Bodensteiner), ECK & Glass, Inc., d/b/a EPG Insurance, Inc. (EPG), and CNH America, LLC, d/b/a Case IH (CNH) (collectively, the defendants).[1] The defendants filed their respective motions for summary judgment, which were granted by the district court. Cannon appeals. Upon our review, we affirm in part, reverse in part, and remand.

## I. Background Facts and Proceedings

Cannon is an independent contractor who hauls manure in tanks and spreads the manure across fields as fertilizer. Cannon's business requires the use of a tractor to pull and operate this equipment. In October 2012—the beginning of the fall hauling season—Cannon found himself in need of a tractor.

Although Cannon had previously used John Deere equipment, he was impressed by the Case IH tractors used by his coworkers.[2] Cannon communicated with Roger Monroe,[3] a salesman at Bodensteiner, through whom Cannon had previously acquired tractors. Bodensteiner is a John Deere dealership that also deals in used farm equipment from other manufacturers. Cannon asked Monroe if Bodensteiner had any used Case IH tractors. Monroe was aware Cannon would use the tractor for manure-hauling purposes. After

---

[1] Cannon also brought claims against Windridge Implements, LLC (Windridge), a Case dealer that performs Case warranty work. Cannon and Windridge have since settled that dispute.

[2] Cannon testified he spoke with these coworkers about Case tractors because they were "Case people," whom he regarded as knowledgeable and trustworthy.

[3] At his deposition, Monroe recounted his extensive history with tractors and his knowledge of their use for manure hauling.

inquiring, Monroe learned Bodensteiner had a Case IH Magnum 305 at another branch location.

The Case IH Magnum 305 (the tractor) was manufactured by CNH in March 2008. The tractor was sold in April 2008 by a Case IH dealer to a company that engaged in liquid-manure disposal. As part of the sale, CNH issued a two-year limited warranty to the original purchaser (the Case warranty). In addition, a purchased protection plan (the PPP) issued, which states it "is a contract between the Provider and the Customer." "Provider" is defined as "EPG Insurance, Inc.," and "Customer" is defined as "the purchaser . . . or an assignee thereof." The PPP provided extended coverage for specific parts of the tractor from April 2010 until April 2013.[4] To be covered by the PPP, the labor for repairs had to be "approved by" EPG and performed "by a service center authorized by [EPG]." Here, that "service center" was Windridge.[5]

The tractor was later traded to Bodensteiner in 2010. Monroe spoke with the Bodensteiner salesman who took the tractor in on trade. That salesman informed Monroe that, to the best of his knowledge, it was a good tractor and it had passed a test drive. Monroe informed Cannon of his conversation with the other salesman and that the tractor had been in and through Bodensteiner's shop and was ready to go. Monroe stated he had no knowledge of the tractor having had issues but it had previously been used in a manure-hauling operation. Both

---

[4] Specifically, it provided coverage "[n]ot to exceed 60 Total Months or 5000 Total Hours Including Manufacturer[']s Base Warranty Period."

[5] Citing the PPP, Cannon contends the PPP provided coverage for repairs up to $150,000, and that, as of January 17, 2012, when EPG last paid for a repair, EPG had only paid $38,785.16. It is unclear where Cannon is getting $150,000, as it is not stated in the PPP; EPG disputes that this number represents the covered amount.

Monroe and a mechanic at Bodensteiner indicated the Case IH Magnum 305 model was a good tractor with adequate horsepower for Cannon's purposes. Cannon understood, however, neither Monroe nor the Bodensteiner mechanic had actually seen the tractor he was purchasing; they were speaking generically about tractors of that make and model. Based on Cannon's past experience with Monroe and Bodensteiner, he assumed Bodensteiner would have inquired about the tractor and any past problems and had a mechanic inspect the tractor.

Monroe told Cannon he would not have the tractor brought from the other dealership unless Cannon wanted it. In deposition testimony, Cannon said: "[S]o I said I want the tractor. If it is a good running tractor, if it is going to work for me I want the tractor. He said it is fit, it is ready, it is ready, it is field ready." Cannon further testified Monroe had informed him the tractor was "ready to go." Cannon chose not to go to where the tractor was to inspect or test drive it but told Monroe he wanted the tractor.[6]

On October 6, 2012, Cannon signed a purchase agreement, paid $1000 for the transport of the tractor, traded in his John Deere tractor, and took possession of the tractor at issue. Later that day, Cannon called Monroe to tell him he was having mechanical problems. At that time, Monroe told Cannon that when the tractor arrived from the other dealership the tractor had been in

---

[6] CNH contends a cursory inspection by Cannon would have revealed some of the issues with the tractor. But Cannon testified the issues with the tractor would not have been identified without an inspection by a mechanic.

Bodensteiner's shop and everything tested out.[7] Monroe claims he told Cannon there would be no warranty given by Bodensteiner on the tractor.

Within the first few days of acquiring the tractor, Cannon discovered a number of issues with it, including malfunctioning of the turbo and the nineteenth gear. When Cannon looked at the turbo, he discovered multiple bolts were rusted and broken, a condition Cannon contends should have been discovered by a mechanic's examination. Then the hydraulic pump exploded, the transmission overheated, and the brakes failed.

In November 2010, Cannon rented a tractor as Windridge performed repairs on his tractor over the winter of 2010 to 2011. In April 2011, the transmission overheated; following repairs, Cannon used the tractor until October 2011, when the transmission overheated again. Windridge again performed repairs from October 2011 through the beginning of 2012.[8] The tractor was returned to Cannon in April 2012, at which time the transmission overheated and the brakes failed. The tractor has not been usable since that date.

Unbeknownst to Cannon, the tractor had a history of issues, including brake failure. Some of the issues with the tractor manifested as early as October 2008, when the tractor was still under the Case warranty. Cannon was informed of this history by Schermann's Implement, which had serviced the tractor when it was owned by the original purchaser.

---

[7] At his deposition, Cannon indicated he felt Monroe had been dishonest with him when Monroe said the tractor "was ready to go." Cannon then explained the tractor had an inadequate draw bar—a bigger one was needed—which had to be replaced.

[8] In his affidavit, Cannon states that "[d]uring this time there was testing, the rear housing was removed and replaced with another used rear housing installed. There were problems with erratic temperature of the transmission but it was thought by Windridge and the Case IH representative, Ryan Hillen, that the tractor should be returned to me for use."

Following the above numerous attempts to resolve the issues with the tractor, Cannon became convinced the tractor was unrepairable and unusable. Neither the mechanics at Windridge nor the Case mechanics have been able to tell Cannon what is wrong with the tractor. EPG denies the tractor is unrepairable, as a Case IH employee was working on a plan to have additional diagnostics done but those efforts were halted when Cannon filed suit.

In April 2013, Cannon initiated this action. Following multiple amendments, Cannon brought the following relevant claims[9] against the defendants: (1) fraudulent misrepresentation (Bodensteiner), (2) breach of implied warranties (Bodensteiner), (3) breach of the implied covenant of good faith and fair dealing (Bodensteiner), (4) equitable rescission (Bodensteiner), (5) breach of contract (EPG), (6) negligent design, manufacture, assembly, testing, and warning (CNH), (7) breach of implied and express warranties (CNH), and (8) fraudulent concealment and nondisclosure (CNH). The defendants filed their respective motions for summary judgment, which Cannon resisted.[10] In March 2015, a hearing was held on the motions. On March 30, the district court granted summary judgment on all of the above claims. Cannon appeals.

## II. Standard and Scope of Review

Our review of the district court's grant of summary judgment is for correction of errors at law. *See Jones v. Univ. of Iowa*, 836 N.W.2d 127, 139 (Iowa 2013).

---

[9] A separate claim against and counterclaim by Windridge Implements, LLC, is not a part of this appeal.

[10] Cannon also requested that the district court delay its ruling to allow more time for discovery, a request the district court denied.

A court should grant summary judgment if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. In other words, summary judgment is appropriate if the record reveals a conflict only concerns the legal consequences of undisputed facts. When reviewing a court's decision to grant summary judgment, we examine the record in the light most favorable to the nonmoving party and we draw all legitimate inferences the evidence bears in order to establish the existence of questions of fact.

*Id.* at 139-40 (quoting *Pitts v. Farm Bureau Life Ins. Co.*, 818 N.W.2d 91, 96-97 (Iowa 2012)). "[A] 'factual issue is "material" only if "the dispute is over facts that might affect the outcome of the suit."'" *Peak v. Adams*, 799 N.W.2d 535, 542 (Iowa 2011) (quoting *Phillips v. Covenant Clinic*, 625 N.W.2d 714, 717 (Iowa 2001)). The burden rests with the movant to show the nonexistence of a material fact. *Pillsbury Co. v. Wells Dairy, Inc.*, 752 N.W.2d 430, 434 (Iowa 2008). However, "[t]he resisting party must set forth specific facts showing that a genuine factual issue exists." *Peak*, 799 N.W.2d at 542 (quoting *Huber v. Hovey*, 501 N.W.2d 53, 55 (Iowa 1993)). "[A] fact question is generated if reasonable minds can differ on how the issue should be resolved." *Pillsbury*, 752 N.W.2d at 434; *see also Bank of the W. v. Kline*, 782 N.W.2d 453, 456-57 (Iowa 2010).

### III. Analysis

Cannon asserts separate claims against each of the defendants, all of which were dismissed on summary judgment by the district court. We address each claim in turn.

## A. Claims Against Bodensteiner

### 1. Fraudulent Misrepresentation and Nondisclosure[11]

The elements of fraudulent misrepresentation are "(1) representation, (2) falsity, (3) materiality, (4) scienter, (5) intent to deceive, (6) reliance, and (7) resulting injury and damage." *Van Sickle Constr. Co. v. Wachovia Commercial Mortg., Inc.*, 783 N.W.2d 684, 687 (Iowa 2010) (citation omitted). With regard to fraudulent nondisclosure, Cannon must also demonstrate a duty to disclose. *See Reynolds v. Solon State Bank*, No. 07-0085, 2007 WL 4553648, at *5 (Iowa Ct. App. Dec. 28, 2007) ("The tort of fraudulent nondisclosure may arise if a party fails to disclose material information and the party had a duty to communicate that information." (citing *Wright v. Brooke Grp. Ltd.*, 652 N.W.2d 159, 174 (Iowa 2002))). "A duty of disclosure may arise 'from a relation of trust, a relation of confidence, inequality of condition and knowledge, or other circumstances as show[n] by a particular fact situation.'" *Id.* (quoting *Irons v. Cmty. State Bank*, 461 N.W.2d 849, 854 (Iowa Ct. App. 1990)).

"Scienter and intent to deceive are closely related elements of [fraudulent misrepresentation], and the same general analysis applies for each." *Van Sickle*, 783 N.W.2d at 688. "Scienter and intent to deceive may be shown when the speaker has actual knowledge of the falsity of his representations or speaks in reckless disregard of whether those representations are true or false." *Id.* (citation omitted).

---

[11] Bodensteiner claims error was not preserved on Cannon's fraudulent nondisclosure claim. We assume, without deciding, error was preserved.

In his appellate brief, Cannon asserts "the information provided by Roger Monroe and the mechanic . . . about the tractor being fit, ready to go, having been in the shop and inspected are material misrepresentations." However, in his deposition testimony, Cannon admitted he did not believe Monroe knew these representations were false.[12] He further admitted he knew the mechanic had not seen the tractor and the mechanic just discussed "the size of the tractor and the horsepower," that "it was a good tractor[, and] that [Cannon] would be happy with the horsepower and what [he] was getting." Cannon admitted the mechanic was just talking generically about the make and model of the tractor and that he had no disagreement with what the mechanic had said. Cannon further stated he "honestly c[ould]n't answer" whether he had "any reason to believe . . . Monroe or anyone else at Bodensteiner actually knew that there was something wrong with th[e] tractor as far as the oil overheating and the brakes overheating."

Cannon now claims there is a dispute of fact on this issue because "[c]learly Monroe wanted to sell a tractor" and "Cannon indicated that any

---

[12] In his deposition testimony, Cannon was asked, "[D]o you think Roger Monroe knew there was something wrong with the [tractor] when it was sold to you?" Cannon replied, "No." Cannon further testified:

Q. Is there anything that you think Roger Monroe told you that was false or was a lie? A. I believe that he told me it was setup and ready to go and it wasn't.

Q. What do you mean when you say it wasn't setup and ready to go? A. Well, the draw bar wasn't the right size.

Q. Okay. He fixed that though? A. Exactly.

Q. Okay. A. And with the power issue.

Q. And again that has been fixed; right? A. Yes.

Q. Okay, Anything else that you think that he misrepresented to you? A. Not that I can think of right now.

Q. Okay. Do you have any reason to believe that Roger Monroe ever acted in any way other than in complete good faith and fair dealing with you? A. No.

Q. You don't think that he was ever trying to fool you into buying a tractor that you knew was a bad tractor for you, do you? A. No.

inspection of the tractor, however cursory, would have revealed the broken off and rusted bolts on the turbo." The assertion that Monroe wanted to sell a tractor does not create an issue of fact. As to the inspection claim, Cannon himself testified it would require a mechanic to identify *the issues with the tractor*.[13] Regardless, neither of these purported facts make the statements of Monroe and the mechanic—who had not yet seen the tractor at issue—knowingly false. Finally, Cannon claims "there is no evidence despite the representations by Monroe that anyone . . . looked at the tractor, got it into the shop, inspected it or tested it in any manner." Monroe provided an affidavit stating neither he nor any of the Bodensteiner staff "had any knowledge of any defect or mechanical problem with the [t]ractor." Cannon's claim that there is no evidence *supporting* Monroe's statements does not create a genuine issue of fact as to whether those statements were true. As noted above, Cannon himself admitted he believed Monroe was unaware of any problems with the tractor and the mechanic was only talking generically about the make and model of the tractor, not this specific tractor itself. Cannon has provided no facts supporting the scienter and intent elements of his claim or creating a genuine issue of material fact as to those elements. Without a knowing misrepresentation, Cannon's claim fails. *See Spreitzer v. Hawkeye State Bank*, 779 N.W.2d 726, 735 (Iowa 2009) (noting fraudulent misrepresentation requires "the defendant knew the representation

---

[13] Cannon was asked: "Is there any inspection that you know of that you could have done that would have identified whatever is the matter with this tractor?" Cannon responded, "Not without having a mechanic do it." Cannon's comment regarding the cursory inspection applied only to the "turbo bolts." Cannon stated that, when he popped the hood of the tractor, he saw "[t]he bolts were all broke[n] off and they were all rusted. . . . Anybody that put that tractor in a shop and put the hood up would have seen that that was not right."

was false"); *see also Wright*, 652 N.W.2d at 175 (noting a duty to disclose may arise in a business transaction where "matters [are] known to [the defendant] that [the defendant] knows to be necessary to prevent [the defendant's] partial or ambiguous statement of the facts from being misleading"). Accordingly, Bodensteiner is entitled to judgment as a matter of law on the fraudulent misrepresentation and nondisclosure claims.

### 2. Breach of Implied and Express Warranties

#### a. Implied Warranties

Cannon alleges Bodensteiner breached the implied warranties of merchantability and fitness for a particular purpose. *See* Iowa Code §§ 554.2314, 554.2315 (2009). However, the two-page sales contract clearly, conspicuously, and repeatedly disclaimed any warranties, including implied warranties. *See id.* § 554.2316 (providing the means by which the implied warranties of merchantability and fitness may be excluded); *see also id.* § 554.1201(2)(j) ("Whether a term is 'conspicuous' or not is a decision for the court."). The first page indicates:

> **IMPORTANT WARRANTY NOTICE**: The John Deere warranty applicable to new John Deere product(s) is printed on the back side of this document. There is no warranty on used products. . . . **IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS ARE NOT MADE AND ARE EXCLUDED UNLESS SPECIFICALLY PROVIDED IN THE JOHN DEERE WARRANTY.**

The second page then provides the specific circumstances in which warranties are provided, which explicitly applies to original purchases of new products. The contract again states "**WHAT IS NOT WARRANTED**" includes "Used Products." Finally, the contract contains a "**NO DEALER WARRANTY**"

provision that states in part, "THE SELLING DEALER MAKES NO WARRANTY OF ITS OWN." We affirm the district court's grant of summary judgment on the implied-warranties claim.[14] *See Sharp v. Tamko Roofing Prods., Inc.*, No. 02-0728, 2004 WL 2579638, at *4 (Iowa Ct. App. Nov. 15, 2004) ("[W]hen a disclaimer is in bold, capit[a]l letters, a reasonable person should have noticed it, and we may consider the disclaimer conspicuous.").

### b. Express Warranties

In his resistance to Bodensteiner's motion for summary judgment, Cannon contended Bodensteiner provided an express warranty that the tractor was in good condition and fit for immediate use in the manure-hauling business. Bodensteiner counters no express warranties were made and Monroe explicitly informed Cannon the only warranty on the tractor was the PPP. An express warranty is created by "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain" or "[a]ny description of the goods which is made part of the basis of the bargain." Iowa Code § 554.2313(1)(a)-(b); *see also Kolarik v. Cory Int'l Corp.*, 721 N.W.2d 159, 163 (Iowa 2006).

---

[14] Cannon avers the disclaimer is of no effect because the purchase agreement was provided after an oral agreement to buy the tractor had been reached. Bodensteiner responds Cannon failed to raise this claim before the district court—in either his resistance to Bodensteiner's summary judgment motion papers or at the hearing on the motion. In fact, Cannon's summary judgment papers explicitly state the "day of the purchase of the tractor" was October 6, 2010, the day the purchase agreement was signed and Cannon took possession of the tractor. Moreover, the district court did not address this claim in its summary judgment ruling, and Cannon failed to file a motion requesting the district court do so. *See* Iowa R. Civ. P. 1.904(2). Therefore, this argument is not properly before this court. *See Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002) ("It is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we will decide them on appeal.").

In its order, the district court granted summary judgment on the warranties claim noting "[t]he written contract between these parties disclaimed any express warranties other than the extended warranty or PPP." "Express and implied warranties can generally be limited or modified as part of the contract for sale . . . ." *Des Moines Flying Serv., Inc. v. Aerial Servs. Inc.*, 880 N.W.2d 212, 217 (Iowa 2016). However, section 554.2316(1) provides "[w]ords or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other; but . . . negation or limitation is inoperative to the extent that such construction is unreasonable." Bodensteiner concedes this "statute denies effect to disclaimer language when it would be inconsistent with the language of [an] express warranty."

We note Iowa Code section 554.2313(2) provides "an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty." *See also Falcon Equip. Corp. v. Courtesy Lincoln Mercury, Inc.*, 536 F.2d 806, 809 (8th Cir. 1976) (per curiam) (finding the "advertisements were merely 'puffing' and commendation of [the] product rather than statements of such specificity and import as to give rise to an express warranty"). However, courts have determined the question of whether a statement constitutes "merely puffing" or opinion is one best left to the fact finder.[15] *See generally Redmac, Inc. v.*

---

[15] We note courts have disagreed on whether statements such as "in good condition" can constitute an express warranty or are merely opinion or puffery. *Compare Weng v. Allison*, 678 N.E.2d 1254, 1256 (Ill. App. Ct. 1997) (finding the statements "mechanically sound," "in good condition," and "had 'no problems'" constituted an express warranty),

*Computerland of Peoria*, 489 N.E.2d 380, 743-44 (Ill. App. Ct. 1986); *see also Tralon Corp. v. Cedarapids, Inc.*, 966 F. Supp. 812, 826 (N.D. Iowa 1997) ("Whether these statements constitute a warranty, as opposed to an expression of opinion, is a question for the trier of fact.").

At summary judgment, our inquiry is limited to whether a genuine issue of material fact exists. Cannon testified Monroe would not have the tractor brought to the dealership unless Cannon agreed he wanted it. Cannon specifically testified he only wanted the tractor "[i]f it is a good running tractor, if it is going to work for me." Cannon testified Monroe then assured him "it is fit, it is ready, it is ready, it is field ready." Following this representation, Cannon instructed Monroe that he wanted the tractor and it should be brought to the dealership. Monroe admits he told Cannon "the tractor was in good condition." And Cannon further testified Monroe told him the tractor was "ready to go." Bodensteiner relies upon the disclaimers in the sales agreement to obviate any express warranties purportedly made. Bodensteiner's defense is subject to resolution of whether Monroe's representations were mere puffing or opinion; we determine, under the facts of this case, resolution of that issue is for the fact finder.

Based upon the above, we conclude a genuine issue of fact remains whether an express warranty was made by Monroe. Therefore, the grant of

and *Pake v. Byrd*, 286 S.E.2d 588, 589 (N.C. Ct. App. 1982) (finding the statement the tractor was in good condition and free from major mechanical defects constituted an express warranty), *with Pell City Wood, Inc. v. Forke Bros. Auctioneers, Inc.*, 474 So.2d 694, 695 (Ala. 1985) (holding auctioneers statements a truck was "in good condition" did not constitute an express warranty), and *McGhee v. GMC Truck & Coach Div.*, 296 N.W.2d 286, 290 (Mich. Ct. App. 1980) (holding statement truck was in "good condition" did not create an express warranty).

summary judgment was in error, and we reverse the district court's grant of summary judgment in favor of Bodensteiner on this claim.

### 3. Breach of Implied Covenant of Good Faith and Fair Dealing

"An implied duty of good faith and fair dealing is recognized in all contracts." *Bagelmann v. First Nat'l Bank*, 823 N.W.2d 18, 34 (Iowa 2012). "The underlying principle is that there is an implied covenant that neither party will do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Alta Vista Props., LLC v. Mauer Vision Ctr., PC*, 855 N.W.2d 722, 730 (Iowa 2014) (citation omitted).

In his petition, Cannon claimed Bodensteiner breached this implied covenant by selling "a known defective tractor to [Cannon] without making an adequate inspection and then an adequate disclosure." On appeal, Cannon claims there is a question of fact whether Bodensteiner had knowledge of any defect in the tractor; therefore, this claim should survive summary judgment. Cannon further claims that, at a minimum, Monroe acted "with reckless disregard for the condition of the tractor and that this dishonesty, by either action or inaction, destroyed the benefit of Cannon's bargain."

For the reasons stated above, even if Cannon's allegations could support a claim for breach of the implied covenant of good faith and fair dealing, Cannon has failed to provide facts that support or create a genuine issue of fact regarding Bodensteiner's alleged knowledge that the tractor was defective.

As to Cannon's "reckless disregard" claim, to find a breach of the implied covenant of good faith and fair dealing requires a contractual term to which the duty can attach. *See Bagelmann*, 823 N.W.2d at 34; *see also Clasing v. Hormel*

*Corp.*, 993 F. Supp. 2d 960, 981 (N.D. Iowa 2004) ("[A] claim of breach of the implied covenant is 'doomed' if it lacks support in the text of the contract."); *Am. Tower, L.P. v. Local TV Iowa, L.L.C.*, 809 N.W.2d 546, 550 (Iowa Ct. App. 2011) ("This implied covenant [of good faith and fair dealing] generally operates upon an express condition of a contract, the occurrence of which is largely or exclusively within the control of one of the parties."). The duty does not create new substantive obligations; instead, it "prevents one party from using technical compliance with a contract as a shield from liability when that party is acting for a purpose contrary to that for which the contract was made." *Mid-Am. Real Estate Co. v. Iowa Realty Co.*, 406 F.3d 969, 974 (8th Cir. 2005).

The contract between the parties was an "order" from Cannon for a specific "Product" from Bodensteiner—here, the Case IH Magnum 305 tractor. There is no term in the contract identified by Cannon that required Bodensteiner to inspect the product or provide any kind of disclosures. *See Alta Vista Props.*, 855 N.W.2d at 731 ("The implied covenant of good faith and fair dealing, however, 'does not give rise to new substantive terms that do not otherwise exist in the contract.'" (citation omitted)). Accordingly, we affirm the district court's grant of summary judgment.[16]

### 4. Rescission

Rescission is an equitable remedy "considered to be extraordinary relief." *Clark v. McDaniel*, 546 N.W.2d 590, 595 (Iowa 1996). "It is not available as a

---

[16] Further, there is no indication Monroe acted other than in good faith. Cannon himself testified he had no reason to believe Monroe acted in any way other than in complete good faith and fair dealing. *See Kooyman v. Farm Bureau Mut. Ins. Co.*, 315 N.W.2d 30, 34 (Iowa 1982) (noting "bad faith" in these circumstances "refers simply to the absence of good faith required by the implied contract" (citation omitted)).

matter of right but only when it is necessary to obtain equity." *Id.* "Three requirements must be met before rescission will be granted: (1) the injured party must not be in default, (2) the breach must be substantial and go to the heart of the contract, and (3) remedies at law must be inadequate." *Id.*

Cannon first argues rescission is appropriate where a fraudulent misrepresentation or nondisclosure has been made. *See Hyler v. Garner*, 548 N.W.2d 864, 870-74 (Iowa 1996). Having affirmed the district court's grant of summary judgment on the fraudulent-misrepresentation and nondisclosure claims, we need consider this argument no further.

Cannon notes a revocation is allowable for noncomforming goods where the noncomformity substantially impairs the good's value to the buyer and the noncomformity was difficult to discover or acceptance was induced by the seller's assurances. *See Campbell v. AG Finder Iowa Neb.*, No. 03-0323, 2004 WL 893937, at *4 (Iowa Ct. App. Apr. 28, 2004) (citing Iowa Code § 554.2608(1)). Of note, in his petition, Cannon seeks equitable, not statutory, rescission. Similarly, the district court ruled upon Cannon's claim for "equitable rescission," finding "[t]his claim in equity fails because Cannon potentially has adequate claims at law for money damages." Cannon did not file an Iowa Rule of Civil Procedure 1.904(2) motion asking the district court to rule upon this alternative, statutory claim. Accordingly, insofar as Cannon invokes this statutory right as a claim distinct from equitable rescission, we find it was not preserved for our review. *See Meier*, 641 N.W.2d at 537.

Cannon next argues rescission is appropriate where "the disclaimer of warranties is found to be unconscionable." However, Cannon fails to argue how

unconscionability could be found in this context. Finally, Cannon argues rescission is appropriate in the event the Case warranty fails of its essential purpose. But the warranty from Case did not pass beyond the first buyer, the PPP was issued by EPG, and Bodensteiner is bound by neither warranty.[17]

We agree with the district court that adequate remedies at law remain and affirm the grant of summary judgment. *See Clark*, 546 N.W.2d at 595 ("[T]he remedies of cancellation of an instrument, or of a rescission, are not ordinarily provided where adequate relief is available in the form of a money judgment." (citation omitted)).

### B. Claims Against CNH

#### 1. Negligence

In granting summary judgment on Cannon's claim of negligence against CNH, the district court noted Cannon's claim "is essentially a products liability claim[] based upon negligence and tort law." The district court concluded, "Iowa law does not allow a plaintiff to recover the economic losses requested by Cannon under a tort theory of products liability. Instead, recovery for this type of damage must be sought under contractual or warranty theories of recovery." On appeal, the parties dispute whether the economic-loss doctrine applies to

---

[17] Cannon also argues the court "failed to grant a continuance in the event that it felt that there was insufficient information" to resolve this claim. Cannon notes the court "did not find the record insufficient." Cannon appears to argue, without supporting explanation, that the district court abused its discretion in not granting a continuance. Based on the record—or lack thereof—before us, we cannot find the district court abused its discretion. *See State v. Means*, 547 N.W.2d 615, 621 (Iowa Ct. App. 1996) ("We review a district court's denial of a motion for a continuance for an abuse of discretion.").

Cannon's claim, in which Cannon seeks past lost income, future lost income, and the loss of the value of the tractor.[18]

"As a general proposition, the economic loss rule bars recovery in negligence when the plaintiff has suffered only economic loss." *Annett Holdings, Inc. v. Kum & Go, L.C.*, 801 N.W.2d 499, 503 (Iowa 2011). "'[A] plaintiff who has suffered only economic loss has not been injured in a manner which is legally cognizable or compensable' whether that loss arose out of negligence or strict liability cases." *Des Moines Flying Serv.*, 880 N.W.2d at 218 (alteration and citation omitted). "Instead, the parties to a contract are assumed to have allocated that risk of economic loss as part of the contract; therefore, 'that document should control the party's rights and duties.'" *Id.* at 219 (citation omitted). The economic-loss doctrine serves to prevent "the tortification of contract law." *Annett Holdings*, 801 N.W.2d at 503. "It is also intended to encourage parties to enter into contracts and to protect parties from being responsible for remote economic losses." *St. Malachy Roman Catholic Congregation of Geneseo v. Ingram*, 841 N.W.2d 338, 351 (Iowa 2013).

Iowa courts have "developed the distinction between tortious and contractual products liability when damage beyond economic loss did occur." *Des Moines Flying Serv.*, 880 N.W.2d at 219. "[T]ort theory was 'available when the harm results from "a sudden or dangerous occurrence, frequently involving some violence or collision with external objects, resulting from a *genuine hazard in the nature of the product defect*."'" *Id.* (citation omitted). "Thus, if the damage

---

[18] Cannon also initially sought damages for emotional distress, although those damages are not raised on appeal.

resulted from a failure of the product to work properly, the claim would sound in contract, but if it resulted from a genuine hazard resulting in a sudden or dangerous occurrence based on the nature of the product defect, the claim would sound in tort." *Id.*; *see also Am. Fire & Cas. Co. v. Ford Motor Co.*, 588 N.W.2d 437, 439 (Iowa 1999) ("[C]ontract law protects a purchaser's expectation interest that the product will be fit for its intended use, whereas products liability law concerns risk of injury to a person or the person's property through exposure to a dangerous product. . . . '[D]efects of suitability and quality are redressed through contract actions and safety hazards through tort actions.'" (citations omitted)).

Here, the facts undisputedly establish that any damage to Cannon resulted from a failure of the tractor to work properly, not from a sudden or dangerous occurrence that would give rise to a tort claim. There is no claim of personal injury or damage or destruction to property apart from the tractor itself. The basis of Cannon's claim is that he received a defective tractor; that claim sounds in contract. *See Determan v. Johnson*, 613 N.W.2d 259, 262 (Iowa 2000) ("[T]he line between tort and contract must be drawn by analyzing interrelated factors such as the nature of the defect, the type of risk, and the manner in which the injury arose. These factors bear directly on whether the safety-insurance policy of tort law or the expectation-bargain protection policy of warranty law is most applicable to a particular claim." (alteration in original) (citation omitted)).

Cannon seeks to avoid the economic-loss doctrine, arguing it should not apply because he was not in privity with CNH. "But the [economic-loss] doctrine is by no means limited to the situation where the plaintiff and the defendant are in

direct contractual privity." *Annett Holdings*, 801 N.W.2d at 504. "[T]he economic loss doctrine can apply when 'a contractual chain of distribution lead[s] to the defendant." *Des Moines Flying Serv.*, 880 N.W.2d at 219 (second alteration in original) (citation omitted). "This aspect of the economic loss rule has several underlying justifications," one being that "[i]n a complex society such as ours, economic reverberations travel quickly and widely, resulting in potentially limitless liability." *Annett Holdings*, 801 N.W.2d at 503. "[A] nonprivity buyer can recover for direct economic loss damages *when the remote seller/manufacturer breaches an express warranty*." *Des Moines Flying Serv.*, 880 N.W.2d at 219 (emphasis added). However, the Iowa Supreme Court has held that, "when considering the compensability of consequential economic loss damages, . . . a seller cannot foresee the uses a remote purchaser might have for the product," "a seller has the right to sell product at a lower price and exclude consequential economic losses," and "the buyer should have to bargain with the immediate seller for consequential economic losses." *Id.*; *see also Beyond the Garden Gate, Inc. v. Northstar Freeze-Dry Mfg., Inc.*, 526 N.W.2d 305, 310 (Iowa 1995) ("[A] buyer should pick his seller with care and recover any economic loss from that seller and not from parties remote from the transaction. . . . By placing the loss on [the purchaser] or by forcing [the purchaser] to bargain with his immediate seller about the loss, we may minimize the total loss to society. If the manufacturer is not the least cost risk avoider, but must nevertheless bear the loss, we may cause him to spend more of society's resources than are optimal to avoid the loss and may unnecessarily increase the cost of the commodity sold." (citation omitted)). Cannon's failure to be in direct privity with CNH does not

rescue his claim from the preclusive effect of the economic-loss doctrine. *See Richards v. Midland Brick Sales Co.*, 551 N.W.2d 649, 650-51 (Iowa Ct. App. 1996). Further, his claim of lost profits does not transform his claim from one of contract to one of tort. *See Nelson v. Todd's Ltd.*, 426 N.W.2d 120, 123 n.1 (Iowa 1988) ("[W]hen the loss is economic, such as loss of profit, loss of bargain, loss of business, etc., then the right of recovery must be governed by the warranty approach." (citation omitted)); *see also Tomka v. Hoechst Celanese Corp.*, 528 N.W.2d 103, 107-08 (Iowa 1995) (finding plaintiff's damages fall within contract-warranty theories and that "consequential economic loss" such as "loss of profits" were not recoverable under warranty theories (citation omitted)).[19] We, thus, affirm the district court's grant of summary judgment.

### 2. Breach of Express Warranties

On appeal, Cannon only argues that CNH is liable for breach of warranties under the PPP.[20] Cannon contends CNH is a party to the PPP because CNH and EPG had a "joint venture" and EPG was an "agent" of CNH. These arguments, however, were not addressed by the district court, and, thus, are not preserved for our review.[21] *See Meier*, 641 N.W.2d at 537. Cannon next argues the PPP failed of its essential purpose. Even were this true, CNH is not bound to

---

[19] Cannon claims our supreme court's extension of the economic-loss doctrine to parties not in privity violates the Iowa Constitution. Insofar as Cannon requests that we find that case law unconstitutional, we decline the invitation. *See Figley v. W.S. Indus.*, 801 N.W.2d 602, 607 (Iowa Ct. App. 2011) ("[W]e are not at liberty to overturn precedent of our supreme court.").

[20] Cannon makes no arguments with regard to the Case warranty—which expired two years after its issuance and, per its express terms, did not extend beyond the original purchaser—thus, we deem any such claim waived. *See Pierce v. Staley*, 587 N.W.2d 484, 486 (Iowa 1998) ("When a party, in an appellate brief, fails to state, argue, or cite authority in support of an issue, the issue may be deemed waived.").

[21] CNH contends these arguments were not even raised before the district court.

the terms of this agreement. Therefore, CNH is not liable for any such failure. Accordingly, we affirm the district court's grant of summary judgment.[22]

### 3. Fraudulent Concealment and Nondisclosure

The basis of Cannon's fraudulent-concealment and nondisclosure claim "relates to [CNH's] failure to advise [Cannon] that the [PPP] was worthless and failed of its essential purpose because the tractor was unrepairable." Cannon reasons the existence of the PPP implies the tractor is repairable but CNH knew before the plan went into effect that the tractor was unrepairable. Cannon argues, because the PPP was transferable, CNH should have been aware that subsequent purchasers would rely upon the inaccurate representation that the tractor was repairable.

Both parties, and the district court, employed the elements of fraudulent concealment outlined in *Estate of Anderson ex rel. Herren v. Iowa Dermatology Clinic, PLC*, 819 N.W.2d 408, 415 (Iowa 2012). However, the court in *Estate of Anderson* was considering the fraudulent-concealment doctrine, which "prevent[s] a party from benefitting from 'the protection of a limitations statute when by his own fraud he has prevented the other party from seeking redress within the period of limitations.'" 819 N.W.2d at 414 (citation omitted). On appeal, Cannon does not assert his fraudulent-concealment or nondisclosure claim to escape the statute of limitations but rather as an independent cause of action.[23]

---

[22] Cannon makes no argument on appeal regarding the breach of any implied warranties; accordingly, this argument is also waived. *See Pierce*, 587 N.W.2d at 486.
[23] In its response brief, CNH argues the fraudulent concealment doctrine cannot be used to stay the statute of limitations on Cannon's claim; Cannon "agrees" that CNH "has not

Regardless, whether invoking the fraudulent-concealment doctrine or asserting a claim of fraudulent nondisclosure, Cannon must prove, amongst other things: CNH made a false statement or concealed material facts, CNH intended Cannon to act upon these representations, and Cannon did act upon these representations to his detriment. *Compare id.* at 414-15 (providing the elements of the fraudulent-concealment doctrine are "(1) [t]he defendant has made a false representation or has concealed material facts; (2) the plaintiff lacks knowledge of the true facts; (3) the defendant intended the plaintiff to act upon such representations; and (4) the plaintiff did in fact rely upon such representations to his prejudice"), *with Lee Cty. Mental Health Ctr., Inc. v. Lee Cty. Bd. of Supervisors*, No. 99-0864, 2000 WL 1288873, at *5 (Iowa Ct. App. Sept. 13, 2000) (identifying the elements of a fraud action—including fraudulent nondisclosure—as requiring "(1) representation; (2) falsity; (3) materiality; (4) scienter; (5) intent to deceive; (6) reliance; and (7) resulting injury and damage"). *See also Clark*, 546 N.W.2d at 592 ("A representation need not be an affirmative misstatement; the concealment of or failure to disclose a material fact can constitute fraud.").

Cannon does not claim—nor does the record support—that CNH made an affirmative misrepresentation. Instead, Cannon alleges the existence of the PPP—which was administered by EPG—implied the tractor was repairable.

"Under Iowa law, the failure to disclose material information can constitute fraud *if* the concealment is made 'by a party under a duty to communicate the

committed any fraud with respect to obscuring the statute of limitations and no such acts have been pled." Accordingly, we need not address this argument.

concealed fact.'" *Wright*, 652 N.W.2d at 174 (citation omitted). Our supreme court has noted, "there is support in Iowa case law for the conclusion that the intentional tort of fraud is not necessarily limited to parties dealing directly with each other." *Id.* at 176. Instead, "what is really important is that the statements were made for the purpose of influencing the action of another." *Id.* "The fact that this element is usually found in transactions where the parties deal directly with one another does not mean that the same goal of influencing another's action cannot be present in business transactions that do not involve direct contact between the plaintiff and the defendant." *Id.* "[A] manufacturer who makes statements for the purpose of influencing the purchasing decisions of consumers has a duty to disclose sufficient information so as to prevent the statements made from being misleading, as well as a duty to reveal subsequently acquired information that prevents a prior statement, true when made, from being misleading." *Id.*

> In summary, a manufacturer's failure to warn or to disclose material information does not give rise to a fraud claim when the relationship between a plaintiff and a defendant is solely that of a customer/buyer and manufacturer with two exceptions. Those exceptions are limited to instances where the manufacturer (1) has made misleading statements of fact intended to influence consumers, or (2) has made true statements of fact designed to influence consumers and subsequently acquires information rendering the prior statements untrue or misleading.

*Id.* at 177.[24]

The only "statements" at issue here, however, pertain to the *existence* of the PPP. When CNH initially sold the tractor—to a party other than Cannon—the

---

[24] Of note, the facts in *Wright* do not involve a resale situation, as is the case with Cannon. In *Wright*, the plaintiffs filed suit against cigarette manufactures alleging the manufacturers failed to warn or to disclose material information. 652 N.W.2d at 174.

PPP was presented. EPG is the entity responsible for coverage under the PPP. Cannon argues CNH should have known as of April 2010 that the tractor was unrepairable. Even if this were true, the tractor was sold as a new tractor and the PPP issued in April 2008. At the time of that sale, there was no indication the tractor was unrepairable and, therefore, nothing to disclose. There is no evidence in the record that CNH had any involvement with Bodensteiner's acquisition of the tractor. *After* purchasing the tractor, Cannon contacted Windridge—a Case dealer that performs Case warranty work—and inquired about the nature and extent of the warranty on the tractor. There is simply no indication in the record that CNH made any misrepresentation to Cannon, had any contact with Cannon prior to his acquisition of the tractor, concealed any information from Cannon, intended to conceal any information, or intended Cannon to rely upon any purported concealment or failure to disclose when entering into the contract with Bodensteiner. *See Hook v. Lippolt*, 755 N.W.2d 514, 525-26 (Iowa 2008) (finding the fraudulent-concealment doctrine did not apply where there was no evidence one defendant intended to conceal facts and no evidence another defendant had any contact with the plaintiff before the limitations period had run); *Hallett Constr. Co. v. Meister*, 713 N.W.2d 225, 231 (Iowa 2006) (finding no fraudulent concealment where there was no evidence of false or misleading conduct, beyond the alleged fraud itself); *see also Kunkle Water & Elec., Inc. v. City of Prescott*, 347 N.W.2d 648, 653 (Iowa 1984) (stating fraudulent nondisclosure can occur where the defendant "purposely suppresses the truth respecting a material fact involved in the transaction").

## C. Claim Against EPG: Breach of Contract

In his petition, Cannon brought a single cause of action against EPG: breach of contract. Cannon claims EPG "refused to pay for or reimburse the cost of repairs or replacement of covered parts of the tractor" and that the PPP, which "extend[ed] a warrant on the powertrain which included the overheating transmission problem which was recurrent," "failed of its essential purpose."

In its ruling on the motion for summary judgment, the district court summarily found: "Extensive discovery was provided and presented to the court in support of [EPG's] motion. The court is satisfied that these materials clearly support the contention that the unpaid bills of around $13,500 were for repairs not covered by the PPP."

On appeal, Cannon claims EPG is responsible under the PPP to cover all repairs so long as the defect in the tractor arose within the contract period (through April 2013). Cannon contends it is irrelevant when reimbursement is sought. Regardless of the potential veracity of Cannon's argument, Cannon does not allege that EPG refused to pay expenses *that were actually submitted to EPG*.[25] Cannon simply contends he believes EPG should have to pay

---

[25] In fact, in Cannon's appellate brief, Cannon captions his argument "EPG's liability for outstanding expenses *unsubmitted* and unpaid." (Emphasis added). The district court found:

> Requests were made for payment [by Windridge] to [EPG] through [EPG's agent] based upon the PPP. Nearly all of these claims were approved and paid to Windridge, with the exception of those which [EPG's agent] determined were non-covered "routine maintenance" charges rather than "repair" bills. The total amount paid on these claims was about $43,000.00. Other than these few claims denied as maintenance, all claims submitted were paid.

The record reflects Windridge submitted two service invoices to EPG: one in the amount of $21,237.03 and the second in the amount of $21,593.93. As to the former amount, EPG paid $19,458.21 and Windridge wrote of the remaining $1778.82. As to the latter

additional amounts, even though those amounts were never sought from EPG. EPG cannot be found in breach of the PPP for failing to pay amounts it was never asked to pay. *See Royal Indem. Co. v. Factory Mut. Ins. Co.*, 786 N.W.2d 839, 846 (Iowa 2010) (providing a claimant must prove the following to prevail on a breach-of-contract claim: "(1) the existence of a contract, (2) the terms and conditions of the contract, (3) that [claimant] has performed all the terms and conditions required under the contract, (4) *the defendant's breach of the contract in some particular way*, and (5) that [claimant] has suffered damages as a result of defendant's breach." (emphasis added)). Cannon's only theory of breach was that EPG refused to pay certain sums; the evidence supports—and Cannon's own testimony establishes—EPG did not refuse to pay any sums, as all amounts submitted were either paid by EPG or written off by Windridge. Accordingly, we affirm the district court. *See Pappas v. Clark*, 494 N.W.2d 245, 248 (Iowa Ct. App. 1992) ("We will affirm the district court if any reason for affirmance appears in the record.").

Cannon also argues on appeal that EPG failed to effectuate repairs, EPG can be found liable as an agent for Case, and the PPP ultimately failed of its essential purpose. Insofar as these arguments were argued by Cannon before the district,[26] they were not addressed or decided in its ruling. Following that

---

invoice, EPG paid $19,326.95 and Windridge wrote off the $2266.08 difference. According to Windridge, Cannon paid $13,500.00, presumably the amount considered by the district court. Windridge indicated these sums were for "non-warrantable work including the rental of [a] tractor"; regardless, there is no indication these amounts were ever submitted to EPG. To the contrary, Windridge stated the amounts were not submitted to EPG. Even in his deposition testimony, Cannon admitted he did not believe certain claims for which he was seeking reimbursement had been submitted to EPG.

[26] EPG argues Cannon failed to raise the agency claim before the district court and failed to secure a ruling on the failure-of-essential-purpose claim.

ruling, Cannon failed to file an Iowa Rule of Civil Procedure 1.904(2) motion requesting that the district court address this unresolved claim. Accordingly, this issue is not preserved for our review. *See Meier*, 641 N.W.2d at 537.

## IV. Conclusion

We affirm the district court's grant of summary judgment on Cannon's claims raised against EPG and CNH. We reverse the district court's grant of summary judgment on Cannon's express-warranties claim against Bodensteiner and affirm the remainder of the district court's ruling.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**



IOWA APPELLATE COURTS

State of Iowa Courts

**Case Number**      **Case Title**
15-0741              Cannon v. Bodensteiner Implement Company

Electronically signed on 2017-03-22 09:24:38